65TH CENTER, INC., et al. *v.* Basil L. COPELAND, Guardian of the Estate and Person of J.C. Gideon, an Incapacitated Person, et al. *v.* Blue Cross and Blue Shield

91-16 . 825 S.W.2d 574

Supreme Court of Arkansas
Opinion delivered March 2, 1992

*Lovett Law Firm*, by: *Brian P. Boyce*, for appellants.

*David Hodges* and *Bay Fitzhugh*, for appellees.

*Davidson, Horne & Hollingsworth*, by: *Cyril Hollings-worth*, for appellees/cross-appellants Blue Cross and Blue Shield.

ROBERT H. DUDLEY, Justice. The primary question in this tort suit is whether a private possessor of land that is adjacent to a public roadway is liable for the injury of a person who unintentionally deviates from the roadway. Because the numerous parties have filed a total of twelve briefs with multiple points of appeal, containing many subpoints, we choose to first state the facts and then address the issues in the order we think they will be most easily understood.

West 65th Street runs east and west in the southwest part of Little Rock. In the 1950's it was a two-lane street located in an area that was beginning to grow as the result of new industries and commercial operations. Traffic became congested and, in the early 60's, as part of an overall city street improvement program financed by a bond issue, the City decided to widen 65th Street to four lanes. The City employed the engineering firm of Garver & Garver to perform the planning and engineering work for the "1965 Street Improvement Project." James Russell Barry, an engineer employed by Garver & Garver, designed the part of the

project that involved 65th Street. One of the many north-south streets intersecting 65th Street is Lancaster Road. Lancaster had two lanes and, from Lancaster facing north toward its intersection with 65th Street, the shoulder on the west side sloped down into the parking lot of a shopping center that was located on the southwest corner of the intersection. 65th Center, Inc. owned the shopping center and parking lot.

Garver & Garver's original design for the construction of four lanes on 65th Street was completed in July 1966. In August 1966, 65th Center, Inc., donated land to the City for the widening of 65th and also the widening of Lancaster where it intersected with 65th Street. Lancaster had to be modified since the additional lanes on 65th would expand over onto Lancaster and that would require a change in width, grade, and alignment. In November 1967, the engineers modified their plans so that Lancaster Road would have three lanes entering into the intersection. Facing north on Lancaster Road, the old right-hand lane would be used as a right turn lane for turning east onto 65th; the old left-hand lane would be used for cars going north straight across the intersection with 65th; and a new lane would be constructed on the far left for vehicles turning south off 65th Street. In order to construct the new lane for vehicles turning south off 65th Street, the 315 feet of Lancaster nearest the southwest corner of the intersection would have to be widened. These modified plans called for building a retaining wall next to the parking lot in order to retain the fill that would be made in the area that previously had been sloped, so that the turning lane would be level with the two older lanes of Lancaster. The result would be that the parking lot would remain as it was, but it would be bordered on the west by a retaining wall that was eight inches thick and seven feet high and, behind that wall, on the right-of-way, would be an area of fill that was eight feet wide, and then the newly constructed lane. The top of the retaining wall would be a few inches above the fill.

The City contracted with Southeast Construction Company, Inc., to build the retaining wall according to the plans. Southeast started construction, and James Russell Barry, the engineer who designed the wall and was supervising the construction, testified that the retaining wall was over on 65th Center's property but the City instructed him to go ahead with the project. The City did not

want to decrease the width of the fill area. Mr. Barry testified that 65th Center was not told that a part of the wall was located on its land. A subsequent survey has revealed that, at the south end, .18 foot of the wall is on 65th Center's property and, at the north end, .71 foot of the wall is on the Center's property. Thus, the City constructed a part of the retaining wall on 65th Center's land.

Southeast completed construction of the wall in 1969. The area between the top of the retaining wall and Lancaster Road was filled in by the City, and, since then, grass has grown over the fill. From the Lancaster Road side of the wall, or east side, the wall is four inches taller than the grass. 65th Center has mowed the grass over the intervening twenty years.

On April 14, 1989, J. C. Gideon, a sixty-eight-year-old blind man, was a passenger on a bus that was owned by the Central Arkansas Transit Authority and operated under an agreement with Professional Transportation Services, Inc., which, in turn, employed the driver, Lee Brooks. The bus was traveling east on 65th Street when it began to lose air from the left side of its suspension system and that loss of air caused the bus to begin to tilt to its left side. Mr. Brooks was able to turn the bus to the right off 65th Street onto Lancaster Road before the left side of the bus frame came to rest on the wheels. He stopped the bus at a point almost parallel with the retaining wall. Mr. Brooks got off and called for another bus. The replacement bus soon arrived and parked directly behind the first bus. Mr. Brooks told the passengers that the replacement bus was parked directly behind the first bus, but neither Mr. Brooks, nor the second bus driver, nor any of the passengers offered to assist J. C. Gideon in changing busses. He did not ask for assistance and, by himself, started to change buses. He stepped down off the first bus and, instead of turning to the right, walked straight away from the bus. He walked the eight feet across the grass covered City right-of-way, tripped over the exposed four inches of the retaining wall, fell the seven feet to the paved parking lot, landed partially on the back of his head, and, as a direct result, suffered unremitting permanent injuries. He was in a coma for a long time and will need care the rest of his life.

Gideon's guardian, Basil Copeland, filed suit against Central Arkansas Transit Authority and its insurer, Clarendon National Insurance Company; Professional Transportation Ser-

vices, Inc.; Lee Brooks; Garver & Garver; Southeast Construction Company; the City of Little Rock; A. B. Corder and Leon Fields, corporate officers of 65th Center, Inc.; and 65th Center, Inc. Blue Cross and Blue Shield intervened to claim a right of subrogation to the $220,635.32 medical expenses it had paid the guardian of Mr. Gideon.

The trial court, or circuit court, granted summary judgment in favor of Central Arkansas Transit Authority and its insurer, Clarendon National Insurance Company. The guardian, Copeland, then entered into a settlement of one million dollars with Mr. Brooks, the driver; Central Arkansas Transit Authority, the owner; and Clarendon National Insurance Company, the insurer of Central Arkansas Transit. That settlement was approved by the probate court in the guardianship proceeding.

The trial court additionally granted summary judgment in favor of Garver & Garver, Southeast Construction Company, the City of Little Rock, A. B. Corder, and Leon Fields.

Ultimately, the plaintiff's case went to trial against only 65th Center, Inc. 65th Center made timely motions for a directed verdict on the basis that it owed no duty to Mr. Gideon. The trial court denied the motions. The jury returned verdicts on interrogatories and found 65th Center liable for 36% of Mr. Gideon's damages, and Lee Brooks and Professional Transportation Services, Inc. liable for 64% of the damages. The jury assessed damages at $1,600,000.00. The result was a judgment against 65th Center in the amount of $576,000.00.

The first assignment of error that we address is 65th Center's argument that the trial court erred in holding that it owed a duty to Mr. Gideon. The argument is meritorious. 65th Center moved for a directed verdict both at the close of the plaintiff's case and after the close of all evidence. *See* A.R.C.P. Rule 50(a).

The first element of a cause of action in tort is "[a] duty, or obligation, recognized by the law, requiring the person to conform to a certain standard of conduct, for the protection of others against unreasonable risks." W. P. Keeton et al., *Prosser and Keeton on the Law of Torts* § 30, at 164 (5th ed. 1984). The question of whether a duty is owed is always a question of law and never one for the jury. *Keck* v. *Am. Employment Agency, Inc.*,

279 Ark. 294, 298, 652 S.W.2d 2, 4 (1983). We hold that 65th Center owed no duty to Mr. Gideon.

■ Our cases, cases from other jurisdictions, and the *Restatement (Second) of Torts*, make it clear that the order, or sequence, in which the creation of a dangerous condition and the construction of a public roadway occur is the primary factor in determining who owes a duty of care to one who unintentionally deviates from that roadway. The law applicable to one sequence of events, and the law urged by the guardian for Mr. Gideon as applicable in this case, is when the possessor of property which abuts an already existing public roadway makes an excavation on his property near the highway or creates or permits some other condition to exist which renders travel on the highway unsafe. In such a situation the law is clear that the possessor of the property has a duty to take reasonable precautions to guard against the danger and to protect travelers from that danger and, if he does not so do, may be held liable for any damages to a traveler who is injured as a result of the dangerous condition when the traveler unintentionally deviates from the roadway. *Strange* v. *Bodcaw Lumber Co.*, 79 Ark. 490, 96 S.W. 152 (1906); *Restatement (Second) of Torts* § 368 (1965); and *see N. Little Rock Transfer Co.* v. *Finkbeiner*, 243 Ark. 596, 420 S.W.2d 874 (1967); G. L. Clark, Annotation, *Liability of Adjoining Property Owner for Injury to One Deviating from Highway or Frequented Path*, 159 A.L.R. 136 (1945). The second rule is applicable when a roadway is established close to a dangerous condition which already exists upon the possessor's land or where the construction of the roadway itself creates a dangerous condition on the possessor's land. In such a case the law places the duty to guard against the dangerous condition upon those who are charged with the duty of maintaining the highway in a reasonably safe condition for travel and not upon the possessor of land upon which the dangerous condition is located. *Birchfield* v. *Diehl*, 126 Ark. 115, 189 S.W. 845 (1916); *Restatement (Second) of Torts* § 368 cmts. c and j (1965); *see also* R. D. Hursh, Annotation, *Duty and Liability of Municipality as Regards Barriers for Protection of Adult Pedestrians Who May Unintentionally Deviate from Street or Highway into Marginal or External Hazards*, 44 A.L.R.2d 633 (1955); and R. P. Davis, Annotation, *Duty as Regards Barriers for Protection of Automobile Travel*, 173 A.L.R. 626 (1948).

We have no hesitancy in holding that the facts of this case come within the second rule; the rule applicable when the construction of the roadway creates the dangerous condition. Here, the City built the retaining wall as an integral part of the roadway, and the wall is the object that constituted the danger. The guardian for Mr. Gideon contends that we should not apply the second rule to this case since the wall is partially on 65th Center's property. It does not matter that the City placed some part of the retaining wall on 65th Center's land. Title or possession is not the determinative factor. As examples, a landowner is not liable for the negligent act of a third party, when the landowner had no control over the person who committed the act and the act was not committed on his account, *Magnolia Petroleum* v. *Melville*, 202 Ark. 382, 150 S.W.2d 220 (1941), but a private individual may be liable for creating a dangerous condition on an existing public roadway, *Arkansas Fuel Oil Co.* v. *Downs*, 205 Ark. 281, 168 S.W.2d 419 (1943), just as a government might bear sole liability for a dangerous condition that it created on private land contiguous to a roadway. *Restatement (Second) of Torts* § 368 cmts. c and j, illus. 7 (1965) provide:

> c. *When highway built near excavation.* If a highway is established in close contiguity to an excavation or other dangerous artificial condition upon the possessor's land, whether constructed by him or otherwise created, the duty to guard such dangerous condition is upon those who are charged with the duty of maintaining the highway in a reasonably safe condition for travel and not upon the possessor of land upon which the dangerous condition is situate.

> j. The rule stated in this Section does not impose any duty upon a possessor of land to remove or guard dangerous conditions which existed at the time the highway was dedicated. Nor does it impose any duty to remove or guard dangerous conditions created by a natural force, such as rains or floods, or by an act of a third person done without the permission of the possessor. On the other hand, if the possessor or his predecessor in possession has created a dangerous condition which is guarded, by a fence or otherwise, the possessor is under a duty to use care to maintain the fence or other guard in a reasonably efficient

manner, and to replace it if it is destroyed or removed even by an unexpectable force of nature or by the intentional or negligent act of a trespasser.

**Illustration:**

> 7.   A is the possessor of land upon which there is a deep quarry. A highway is laid out and established running along the edge of this existing quarry. It is the duty of the municipality maintaining the highway for public travel, and not of A, to erect and maintain fences or other guards to protect travelers upon the highway.

A "possessor of land" is a person who is in occupation of the land with intent to control it. *Restatement (Second) of Torts* § 328E (1965). Our case of *Birchfield* v. *Diehl*, 126 Ark. 115, 189 S.W. 845 (1916), although written before the publication of the *Restatement*, is on point. There, a city, under the valid exercise of its police power, ordered the landowner to construct a sidewalk on a certain grade. The sidewalk, when built on that grade, left a drop to the abutting ground of three to five and one-half feet. The landowner neither filled the drop next to the sidewalk nor put up a guard railing. A pedestrian fell off the walk and sued both the landowner and the city. The holding of the case is so precisely on point that we quote it:

> Had the city itself constructed this walk, it would not have been liable to appellant for his injury, because the ˙ cities of this State are not liable for such damages.

> Nor can one be held liable who obeys the city's mandate and does an act which the city may require and for which it would not be liable had the act been done by itself.

> Here the owner did nothing to his lot to change its condition, and it was in obedience to a valid exercise of the police power of the city that he constructed the walk. The primary duty to construct sidewalks rests upon the city, but, in the exercise of its authority, it shifted that burden to the property owner, and this added burden was discharged when the property owner complied with the ordinance. [Citations omitted.]

*Id.* at 117, 189 S.W. at 846.

■ In the same manner the City, in the case at bar, built the retaining wall to hold the fill for its elevated right-of-way. Such action by the City did not place a duty of care on the abutting landowner for someone who unintentionally deviates from that right-of-way.

The guardian for Mr. Gideon suggests that 65th Center's mowing the City's right-of-way and painting the top of the wall yellow constituted "maintaining" the road as provided in comment c of the *Restatement* quoted above. The guardian does not offer a citation of authority for such an argument, and we are unable to see any merit to it. The fact that one sometimes voluntarily mows the grass on a public right-of-way, or occasionally paints the top of a roadway wall, does not obligate that person to maintain the roadway in a safe condition. Such an act does not give the volunteer control over the public roadway, nor does it give him the right to direct the purposes for which the public's interest may be used, nor does it obligate him to any responsibility to continue his voluntary work.

The guardian argues that 65th Center is barred in this appeal from raising the issue of duty. The argument is without merit since 65th Center moved for a directed verdict at the close of the guardian's case and again at the close of all of the evidence. When it made its motions, 65th Center expressly argued comment c of § 368 of the *Restatement (Second) of Torts*. Thus, it did all that it needed to do to preserve the issue, and the trial court erred in holding that 65th Center owed a duty to Mr. Gideon. As a result, we reverse and dismiss on 65th Center's direct appeal on the issue of duty. We do not address 65th Center's five other assignments of error.

■ We now address the assignments of error by J. C. Gideon's guardian on his direct appeal. He argues that the trial court erred in granting summary judgment in favor of Garver & Garver and Southeast Construction Company. The trial court's rulings on these points were eminently correct. The retaining wall was designed in 1967 and constructed in 1969. The accident occurred in 1990.

Ark. Code Ann. § 16-56-112(b)(1) (1987) provides:

> No action in tort or contract, whether oral or written, sealed or unsealed, to recover damages for personal injury or wrongful death caused by any deficiency in the design, planning, supervision, or observation of construction or the construction and repairing of any improvement to real property shall be brought against any person performing or furnishing the design, planning, supervision, or observation of construction or the construction and repair of the improvement *more than four (4) years after substantial completion of the improvement.* [Emphasis added.]

In an effort to avoid the application of this statute of limitation, the guardian makes four arguments. First, he argues that the retaining wall is not "an improvement to real property." We summarily dispose of the argument. The retaining wall is built of concrete, is seven feet high, 125 feet long, and eight inches thick and has a footing underneath. It is a permanent structure and is an "improvement." *See DePriest* v. *Piekert*, 211 Ark. 460, 200 S.W.2d 804 (1947). Second, he argues that the allegations of negligence do not arise from the "design, planning, supervision, or observation of construction or the construction and repairing" of an improvement to real property. Garver & Garver clearly designed and observed the construction of the improvement, and Southeast just as clearly constructed it. Third, he argues there was no "substantial completion of the improvement" in 1969 because a restraining bar or guardrail was not placed on top of the wall. Again, the argument is without merit since the wall was completed when the work was finished in accordance with the contract, and the City accepted it. Fourth, the guardian argues that this is not a "deficiency in construction" case, but instead, "concerns a failure to put up a guardrail." In *Okla Homer Smith Furniture Mfg. Co.* v. *Larson & Wear, Inc.*, 278 Ark. 467, 470, 646 S.W.2d 696, 698 (1983), we wrote that this statute of limitation was to protect "persons engaged in the construction industry from being subject to litigation arising from work performed many years prior to the initiation of the lawsuit." The only exception is when there is a "fraudulent concealment of the deficiency." Ark. Code Ann. § 16-56-112(d) (1987). The absence of a guardrail was not concealed.

The guardian next argues that the trial court erred in ruling that he did not have a claim against the City of Little Rock. In his

complaint, the guardian pleaded that the City failed to use ordinary care in failing to install a guardrail or warning devices on the retaining wall. The trial court ruled that, as a matter of law, the guardian did not have a claim against the City. The ruling was correct. Ark. Code Ann. § 21-9-301 (1987) provides:

> It is declared to be the public policy of the State of Arkansas that all counties, municipal corporations, school districts, special improvement districts, and all other political subdivisions of the state shall be immune from liability for damages. *No tort action shall lie against any such political subdivision* because of the acts of their agents and employees. [Emphasis added.]

We have repeatedly upheld the tort immunity of municipalities for the negligence of their employees. *See, e.g., Autry* v. *Lawrence*, 286 Ark. 501, 696 S.W.2d 315 (1985); *Augustine* v. *City of West Memphis*, 281 Ark. 162, 662 S.W.2d 813 (1984); and *Matthews* v. *Martin*, 280 Ark. 345, 658 S.W.2d 374 (1983). These cases, and many others, dispositively establish that governmental subdivisions of this State cannot be held liable for tortious injury.

██ The guardian contends that the City's tort immunity is barred because a part of the retaining wall is located on private property, but he cites no authority for the proposition. We are not persuaded by the argument, especially in view of the first phrase of the last sentence of the applicable statute, quoted and emphasized above. He also argues that it was illegal for the City to use public funds to construct a part of the retaining wall on private property; thus, he argues, the City committed an ultra vires act and lost its immunity. We quickly dispose of the argument by stating that the wall was built for a public purpose, and a city may make improvements on private property when the improvement is for a public purpose. *City of Ft. Smith* v. *Bates*, 260 Ark. 777, 544 S.W.2d 525 (1976). In addition, the statute is absolute in its terms of immunity for the governmental subdivision.

█ The guardian's next assignment of error is that the trial court erred in granting summary judgment for A. B. Corder and Leon Fields, who the were directors and officers of 65th Center, Inc. The guardian does not cite any cases for his argument, and we choose not to research the issue. *See Dixon* v. *State*, 260 Ark.

857, 545 S.W.2d 606 (1977). However, it is obvious that the officers of the abutting landowner corporation owed no duty of care to Mr. Gideon if the corporation owed no such duty.

The final point of the guardian's direct appeal which we address involves the expenses of expert witnesses and comes about in the following way. Prior to the time that Professional Transportation Services, Inc. and Lee Brooks reached their settlement with the guardian, the attorneys for Professional Transportation and Brooks agreed with the attorneys for the guardian to have expert witnesses come to Little Rock, rather than have the lawyers go to the various cities where the experts lived, and the attorneys for Professional Transportation and Brooks were to pay the expenses of the experts. No amount was fixed for these expenses. After the expert witnesses were deposed, in accordance with the agreement, they sent statements to one of the attorneys for the guardian who, in turn, forwarded the statements to the attorneys for Professional Transportation and Brooks. The latter attorneys paid a substantial portion of the statements, but refused to pay all of the claimed expenses because they thought the amount was unreasonable. The attorneys for the guardian filed a motion asking that the attorneys for Professional Transportation and Brooks be compelled to pay the statements in full. The trial court conducted a hearing on the motion, fixed the amount it considered reasonable, and ordered the attorneys for Professional Transportation and Brooks to pay that amount.

▐ A.R.C.P. Rule 26(4)(C) provides that fees and expenses must be "reasonably" incurred. In *Marrow* v. *State Farm Ins. Co.*, 264 Ark. 227, 570 S.W.2d 607 (1978), we said that a trial court has "a wide latitude of discretion" in determining matters related to discovery, and that includes determining the amount of "reasonable" expenses. We have examined the hours claimed, the rates claimed, the travel expenses claimed, and we cannot say the trial court abused its wide latitude of discretion in setting a "reasonable" amount for the expenses.

▐ It is necessary for us to address only one of the remaining points of appeal. It involves Blue Cross and Blue Shield's cross-appeal and its alleged right of subrogation to a part of the proceeds of the settlement between the guardian and Professional Transportation and Brooks. As previously set out,

prior to the trial against 65th Center, the guardian for Mr. Gideon settled the case against the bus company, the operator of the bus line, and the bus driver for one million dollars. That settlement was approved by the probate court, and those funds are under the control of that court. Blue Cross asked the court in which this case was pending, the circuit court, to reimburse it under its right of subrogation, for the funds it has paid out for the medical expenses of Mr. Gideon. It asked that it be reimbursed out of the settlement funds, the funds under the jurisdiction of the probate court. The trial court refused to do so, holding that the probate court alone had jurisdiction over those funds. The ruling of the trial court was correct. The issues are fully addressed in the recent case of *Forehand* v. *American Collection Serv., Inc.*, 307 Ark. 342, 819 S.W.2d 282 (1991), and we need not repeat that discussion in this case, other than to state that the circuit court correctly held that it did not have jurisdiction over the payment of claims against the ward's account.

Affirmed in part on direct and cross-appeal, and reversed and dismissed in part on direct appeal.

HAYS and BROWN, JJ., dissent.

STEELE HAYS, Justice. The majority opinion acknowledges the general rule, i.e., when possessors of land create a hazardous condition, or permit one to exist, so near a highway that they realize it involves an unreasonable risk to others, the possessor is under a duty to take reasonable precautions to guard against the danger by protecting travelers from such danger. If they fail to do so they are subject to liability for any injuries a traveler may incur as a result of a dangerous condition when the traveler unintentionally strays from the roadway. The general rule clearly provides a legal base for the holding of the trial judge that 65th Center, Inc. (Appellant) owed a duty to Mr. Gideon.

Notwithstanding the general rule, the majority concludes the law recognizes no duty under the factual setting of this case. I respectfully submit that the duty owed to Mr. Gideon and other travelers is simply one of reasonable care, not only with respect to conditions within the premises of the appellant but to those outside as well. *See* W. P. Keeton et al., *Prosser and Keeton on The Law of Torts* § 57, at 387 (5th ed. 1984):

## Danger to Highway

A large proportion of the cases have involved danger to an adjacent public highway. The public right of passage carries with it, once the highway has been established, an obligation upon the occupiers of abutting land to use reasonable care to see that the passage is safe. They are not required to maintain or repair the highway itself, but they will be liable for any unreasonable risk to those who are on it, such as an open coal hole in the sidewalk, or overhanging objects ready to fall. The obligation extends also to any artificial conditions, such as an excavation or utility pole next to the street, or a protrusion into it, which are dangerous to those who use it.

The status of a user of the highway has been extended to those who stray a few feet from it inadvertently. It has been extended also to those who deviate intentionally for some purpose reasonably connected with the travel itself, such as detouring an obstruction, or stepping out to avoid others on the ·sidewalk, or even stopping in a doorway to tie a shoelace. On the other hand, one who intentionally leaves the highway for some purpose of his own not reasonably connected with travel is not regarded as a user of the highway, but becomes a trespasser, or at most a licensee. And one who wanders into a pit a considerable distance from the road after traversing the adjoining land, even though he does so inadvertently, is denied such protection, and treated as a trespasser. The distance would appear not to be so important in itself, but merely to bear upon the existence of a recognizable danger to the normal users of the highway. On the same basis the occupier of abutting land is required to guard against the tendency of children to stray from the road, where there is a condition close to it which will be unreasonably dangerous to them if they do. Likewise, if he so maintains a part of his land that it appears to be a highway, as where he paves a strip next to the street, or gives a private way the appearance of a public one, he must use reasonable care to see that there is no danger to those who are misled into using it.

There are a number of relevant factors which inveigh on the

side of an existing duty: since its inception some twenty years ago appellant has maintained the strip between the top of the wall and the street; tenants of the shopping center testified that cars regularly drove off the ramp leading into the center, once from so near the ramp's summit that the car landed on its top; the danger itself is patent — an abrupt, seven foot drop from street level to a hardened surface below, unfenced and unmarked, a mere eight feet from the edge of a busy city street. Such a condition constitutes, to my view at least, a hazard comparable to an open man-hole and the very nature of this incident underscores the hazard. The record, so far as I can determine, does not reflect the distance from the wall to the front door of the bus, from which Mr. Gideon emerged, but the driver testified that he stopped the bus on the grassy strip and thus hardly more than two steps, three at most, were required to reach the wall. Had the incident occurred at night even passengers with vision could have been at risk. Finally, appellant's property is not private property as that term is generally understood, 65th Center is a commercial shopping mall, consisting of a college of business enterprises dedicated to the attraction of as many would-be shoppers as possible from the passing procession of motorists, pedestrians, etc.

The majority relies on Comment C of § 368 *Restatement (Second) of Torts*, which places the duty to guard against dangerous conditions upon those charged with maintaining the highway when a roadway is established close to a dangerous condition which already exists upon the possessor's land or when the construction of the roadway itself creates a dangerous condition on the possessor's land. The result of the majority's application of Comment C is to completely absolve 65th Center, Inc. from liability using a mechanistic rationale based primarily on who maintains the highway and dependent on priority in time as to the respective uses of the land by 65th Center and the City of Little Rock. In *Prosser and Keeton on the Law of Torts* § 57 (5th ed. 1984) Prosser discusses the general rule and notes that in determining the rights and liabilities arising out of the condition of land, the more significant consideration is the *possession* of the land because the possessor is in a better position to discover and control the dangers.

There have been few cases decided that have directly applied Comment C *Restatement (Second) of Torts* § 368. Prosser

suggests that the form of the *Restatement* has had limited utility because it reduces the law to a fixed set of black letter rules while ignoring all contrary authority. This is unfortunate because the law of torts in its present stage of development does not lend itself well to such treatment. *Prosser and Keeton on the Law of Torts* at § 3. Prosser discusses how the law in this area is changing as rural communities evolve into urban centers. *Id.* at § 57. Consequently, what may have been sound fifty years ago is now outmoded and even inappropriate.

The Supreme Court of New Jersey has recognized that the rule of nonliability is derived from conditions that no longer exist and is not responsive to current urban conditions. In *Stewart v. Wallace Street, Inc.*, 87 N.J. 146, 432 A.2d 881 (1981), it broke from the rule by extending to abutting commercial property owners liability for failure to perform necessary maintenance of sidewalks. The *Stewart* opinion confined the extension of the duty to maintain abutting property to owners of commercial property and set forth several sensible reasons for departing from the rule of nonliability: first, society has an interest in the safety of those traveling on public roads and highways and with the ever-increasing development of shopping centers and the sprawl of adjacent parking lots it has become increasingly difficult for motorists and pedestrians to avoid such routes. *Id.* Unquestionably, a consequential benefit of this growth to the landowner is the convenience of shopping centers and malls located in close proximity to public access.

Second, the New Jersey Supreme Court expressed the opinion that it was obviously unfair to permit a property owner "to sit idly by and watch with impunity" a dangerous condition just outside his premises become a trap for unwary pedestrians or motorists and to escape liability when "all too foreseeable injuries occur." *Id.* at 154, 432 A.2d 881 at 886 [citing *Murray v. Michalak*, 58 N.J. at 223, 276 A.2d 857 (dissenting opinion)]. A third relevant factor is that the land possessor is in the best position to prevent or substantially lessen the likelihood of an accident. *Id.* The court also observed that the rule of nonliability undermines basic goals of tort law in two critical ways. First, it has left many without recourse who have suffered serious injury. Additionally, the rule gives abutting property owners no incentive to repair dangerous conditions thereby preventing injuries and

actually creates a disincentive because an owner currently immune from liability will be liable for repairs voluntarily undertaken but negligently performed. *Id.*

When we give the circumstances of this case their strongest probative weight it seems clear to me that there is a duty under the law and reasonable minds could easily differ as to whether an injury might foreseeably result from a breach of that duty. *Keck v. American Employment Agency, Inc.*, 279 Ark. 294, 652 S.W.2d 2 (1983); W. P. Keeton et al., *Prosser and Keeton on the Law of Torts* § 45, at 320 (5th ed. 1984). That being so, it was not error to submit that issue to the jury.

BROWN, J., joins in this dissent.